STATE of Minnesota, Respondent,

v.

John J. DeBAERE, Appellant.

No. C7-83-544.

Supreme Court of Minnesota.

Oct. 12, 1984.

subd. 1 (Supp.1983). In this instance, the legislature seems to require the union to abide by

the employee's option.

C. Paul Jones, Public Defender, Carolyn Tucker, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, George Harrelson, Lyon County Atty., Marshall, for respondent.

**SIMONETT, Justice.**

Defendant was found guilty by a district court jury of burglary and criminal sexual conduct in the first degree, Minn.Stat. §§ 609.58, subd. 2(1)(b), and 609.342(e)(i) (1982). The trial court sentenced defendant to an executed prison term of 65 months. On this appeal, defendant argues (1) that his convictions should be reversed outright because the evidence of his guilt was legally insufficient or (2) that he should at least be given a new trial because the trial court prejudicially erred (a) in admitting *Spreigl* evidence concerning sexual assaults of five other women, (b) in refusing to admit evidence that defendant was gentle with women, and (c) in refusing to let defense counsel ask one of the *Spreigl* witnesses on cross-examination if she previously had had a consensual sexual relationship with defendant. We affirm.

The complaint charged defendant with unlawfully entering the residence of a woman in Marshall early on April 19, 1982, and raping her, causing "personal injury" in the process.

The victim testified that she met defendant at a bar in October 1981; that he introduced himself as "Joe"; that he gave her a ride home; that he persuaded her to let him come in; and that she had consensual sexual intercourse with him. She testified that during the act of intercourse defendant injured her, angering her so much that she told him to get out and that she did not want to see him again.

She testified that defendant left as requested but subsequently started to harass her, coming by her house uninvited at 2 or 3 a.m., ringing the doorbell and waking her up. She did not let him in on these occasions but told him to leave. One day he stopped by in the afternoon and tried to set a date with her but she refused. In late November or early December when she was sick in bed, he entered the house through a door that her son had forgotten to lock, entered her room and started to climb into bed with her. She had a coughing spell, left the room and he followed. She struggled with him in the living room, then again had a coughing spell, which caused him to leave. In late December defendant again entered the house, this time when her 10-year-old son mistakenly let him in, and jumped on the bed, saying that he wanted to have sex. Defendant fled when the son entered the bedroom. The victim called the police on both occasions when defendant entered her house uninvited but she was not able to give them

an accurate or complete name, since she knew defendant only as "Joe." She also told two friends about the man who was bothering her.

She testified that early on April 19th defendant entered her house, woke her and, after a struggle, raped her. She reported the incident to her deceased husband's sister, who called someone at a woman's shelter, who in turn apparently called the police.

Based on the description the victim gave, the police assembled a display of five photographs, including one of defendant, and the victim immediately identified defendant's picture as that of the rapist. The police arrested defendant later that morning. He admitted having had sexual intercourse with the victim, claiming that he had had an ongoing consensual sexual relationship with her and that he paid her for each act of intercourse. He claimed that on the 19th he had rung the doorbell, that she had signaled him to come in, and that she had consented to the act of intercourse. He implied in his testimony at trial that the victim called the police on him because, for the first time, he forgot to pay her for the sexual act. He admitted on cross-examination that he dropped off another woman before going to the victim's house on the 19th and that he "made advances" toward her also, causing her to be frightened.

1. Defendant's first contention, that the evidence of his guilt was legally insufficient, relates to both convictions. In his brief defendant focuses his argument on the sex conviction, specifically on the evidence that the sexual penetration was nonconsensual and the evidence that the victim sustained "personal injury."

■■■ Defendant claimed that the victim invited him into the house when he rang the doorbell; the victim testified that she did not know how he got in but also testified that her children sometimes forgot to lock the door and that defendant had come in uninvited before, knowing that she had told him she did not ever want to see him again. Clearly, therefore, the evidence of an unconsented entry was sufficient. De-

fendant's wrongful intent on entering was inferable from the evidence of his assaultive conduct once inside.

■■■ Generally, there is no requirement that the testimony of a complainant in a prosecution for sexual assault be corroborated. Minn.Stat. § 609.347, subd. 1 (1982); *State v. Ani*, 257 N.W.2d 699 (Minn.1977) (stating, however, that in an individual case the absence of corroboration might mandate a holding by the court that the evidence was legally insufficient). The victim's testimony was positive and not significantly impeached. There also was strong corroborating evidence, including: (a) evidence of prompt complaint; (b) evidence as to the victim's distraught condition when she talked with the police; (c) evidence of prior complaints concerning defendant harassing the victim; and (d) evidence of personal injury, something a woman normally does not sustain in an act of consensual sexual intercourse. We hold that the evidence that the sexual penetration was nonconsensual was sufficient.

Defendant's claim that the evidence of "personal injury" was legally insufficient is answered by a number of our decisions, particularly *State v. Reinke*, 343 N.W.2d 660 (Minn.1984), where we found sufficient evidence of "personal injury" in evidence of an abrasion in the area of the victim's pubis, pain at the time of the assault, and subsequent back pain attributable to the assault. The victim's injuries in this case (a sore breast, scratches on her arm and face, bruises on her rib cage and legs, and stiffness and soreness in her legs) were comparable.

2. Defendant makes three arguments in support of his contention that he should be given a new trial.

(a) First, he argues that the trial court erred in admitting the *Spreigl* evidence. This evidence consisted of the following:

(i) Testimony by two women that in the fall of 1979 defendant, whom they both knew but had never dated, came to their apartment early in the morning after a dance they had all attended and, after be-

ing admitted, attempted but failed to force each of them to have sexual intercourse with him before they joined forces and pushed him out of the apartment. They did not report the matter to the police.

(ii) Testimony by a woman that on April 27, 1980, she met defendant at a dance, that afterward defendant offered to drive her to a restaurant but instead drove her to a farm field where he raped her. Defendant was convicted of criminal sexual conduct in the fourth degree (apparently as a result of a guilty plea) in connection with that incident.

(iii) Testimony by a woman, who knew defendant but had not dated him, that early on the morning after Halloween, 1981, defendant, after gaining entrance to her apartment by saying that he needed to talk, attempted to force her to have sexual intercourse with him before she broke free, picked up a chair and ordered him to leave. She did not report the incident.

(iv) Testimony by a female relative of defendant that early on January 1, 1982, defendant entered her room at her father's house without permission, jumped into bed with her, and tried to force her to have sexual intercourse with him before he was scared off when a light flickered.

■ As stated in *State v. Morrison*, 310 N.W.2d 135, 137 (Minn.1981):

The key tests in determining admissibility of *Spreigl* evidence are whether the evidence is clear and convincing that defendant participated in the *Spreigl* offense, whether the *Spreigl* evidence is relevant and material to the state's case, and whether the potential of the *Spreigl* evidence for unfair prejudice substantially outweighs its probative value.

In determining relevance and materiality, the trial court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in time, place, or modus operandi. As stated in *State v. Matteson,* 287 N.W.2d 408, 411 (Minn.1979), "Generally, the greater the

similarity of the other crime to the crime charged in time, place or modus operandi, the greater the chance that the other crime is relevant." We have been flexible in applying this "test" on appeal, upholding admission notwithstanding a lack of closeness in time or place if the relevance of the evidence was otherwise clear. *See, e.g., State v. Matteson, supra; State v. Bolts,* 288 N.W.2d 718 (Minn.1980); *State v. Bellcourt,* 312 Minn. 263, 251 N.W.2d 631 (Minn.1977).

■ In this case the defendant allegedly entered the house of a female acquaintance without consent, forced himself on her, and then, when complaint was made, claimed consent. The other-crime evidence showed a pattern of similar aggressive sexual behavior by defendant against other women in the community. Given our prior cases— *e.g., State v. Morrison,* 310 N.W.2d 135 (Minn.1981)—we believe that the trial court did not abuse its discretion in admitting the evidence, which was highly relevant to the issue of consent.

■ Defendant also argues that he did not receive adequate notice of the prosecutor's intention to call one of the two women attacked by defendant in the apartment in the fall of 1979 and that at least her testimony should have been excluded. There is no merit to this argument. Since defendant knew of the prosecutor's intent to present evidence of the incident, knew of the woman's presence during the incident, and had good reason to suspect that the prosecutor might call the woman, the court properly refused to bar her testimony concerning the incident. Further, defendant has failed to show any prejudice.

■ Defendant also claims that the court should have given a cautionary instruction before each *Spreigl* witness testified. The court did not give one before defendant's relative testified about the incident of January 1, 1982, but defense counsel apparently did not request one at that time. Later, before the two women attacked in the fall of 1979 testified, defense counsel requested and obtained such an instruction, the court stating to the jury

that the instruction also related to the testimony of the earlier *Spreigl* witness. The court also gave one, using language requested by defense counsel, before the victim of the April 27, 1980, incident testified, and the court reminded the jury of the cautionary instruction before the last *Spreigl* witness testified. The court also gave a cautionary instruction as part of the final instructions to the jury. Therefore, it is clear that the jury received adequate instructions on the use and misuse of such evidence.

(b) Defendant also argues that the trial court erred in refusing to admit evidence that defendant was a gentleman with women.

■ Minn.R.Evid. 404(a)(1) provides that a defendant in a criminal case may introduce "evidence of a pertinent trait of his character" for the "purpose of proving that he acted in conformity therewith on a particular occasion." Usually this evidence must take the form of reputation or opinion evidence. Minn.R.Evid. 405. The defendant may not prove specific instances of good conduct unless the character trait is "an essential element of a charge, claim, or defense." Rule 405(b). On cross-examination of a character witness, the prosecutor may inquire into relevant specific instances of conduct. For a good discussion, see 22 C. Wright & K. Graham, Federal Practice and Procedure § 5237 (1978), and see *State v. Posten*, 302 N.W.2d 638, 642 (Minn.1981) (stating that it was nonprejudicial error to refuse to let defendant, accused of sexually penetrating a 6-year-old girl, prove his good character with respect to the care of children). Although a defendant normally cannot prove his good character by specific instances of good conduct, there arguably may be cases where he should be permitted to show specific instances of good conduct to rebut or contradict evidence of specific instances of bad conduct—*e.g.*, *Spreigl* evidence—introduced by the state pursuant to Rule 404(b).

■ In this case defendant called three character witnesses. The first, Steven Doom, a friend of defendant, was asked by defense counsel on direct examination only about defendant's reputation for truthfulness. Defense counsel had a difficult time getting Doom to understand what he wanted. Doom first said that defendant was "nice," that they had had "good times" together, and that defendant had "never done nothing wrong on me." Then he said that defendant "has always told me the truth." That was stricken. Then he said that he had not heard bad things about defendant from other people. It was not until redirect that defense counsel asked him if he had seen defendant with "ladies" and if he had an opinion as to defendant's relationships with them. The prosecutor objected and the court sustained the objection, stating in part that the question was "outside the scope of the cross" and therefore was an improper question to ask on redirect examination. This ground was a clearly adequate ground for excluding the evidence.

The next character witness, Bradley Olson, a friend of defendant, was asked about defendant's reputation for truthfulness. He testified that defendant is "always telling the truth" and that he had never heard anything "which reflected upon the lack of truth and veracity for telling the truth." He was not asked about defendant's character with respect to women.

The final character witness was Cheri Kirk, a schoolteacher from another town who knew defendant. Defense counsel asked her about defendant's reputation for truthfulness but failed to establish foundation for the questions since the witness did not consider herself part of the Marshall community. She was not asked about defendant's character with respect to women.

(c) Defendant's final contention relates to the trial court's refusal to let defense counsel cross-examine a *Spreigl* witness, his relative, about whether she had had a prior consensual relationship with defendant.

■ Minn.R.Evid. 404(c)(1)(A)(ii) provides for the admission of evidence of prior sexual conduct of a victim of an alleged

sexual assault where consent is a defense and the evidence relates to the victim's prior sexual conduct with the defendant. Professors Wright and Graham argue that Rule 404(a)(2) should be interpreted to allow the defense to introduce evidence concerning the character of the victims of other crimes (*i.e.*, *Spreigl* offenses) used by the prosecution under Rule 404(b). 22 C. Wright & K. Graham, Federal Practice and Procedure § 5237 (1978). A defendant similarly should be able to introduce evidence concerning a prior sexual relationship between him and the victim of a *Spreigl* offense where the defendant claims consent with respect to that offense. Here the court let defense counsel cross-examine the victim of the charged offense about his claim that he had had an ongoing consensual sexual relationship with her, but the court did not permit defense counsel to similarly cross-examine defendant's relative, the victim of one of the *Spreigl* offenses. This was error but the error was not prejudicial in view of the multitude of *Spreigl* witnesses. Even if the defense had discredited the witness' testimony, the defense still would have had to contend with the testimony of the other *Spreigl* witnesses, none of whom was significantly impeached. Further, defendant in his testimony did not discredit the witness' testimony. Instead, he claimed that he was so intoxicated on the night in question (January 1, 1982), that he did not know whether there was any truth to her testimony or not. Thus, even if defendant had had a prior sexual relationship with her, it is still possible that she was telling the truth.

In conclusion, we believe that defendant received a fair trial and was properly found guilty of burglary and criminal sexual conduct in the first degree.

Affirmed.